**2023 IL 128602**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 128602)

CLARK ALAVE, Appellee, v. THE CITY OF CHICAGO, Appellant.

*Opinion filed December 14, 2023.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Holder White, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Clark Alave, filed an amended negligence complaint against defendant, the City of Chicago (City), alleging that he was riding his bicycle on the roadway near a Divvy station[1] at the intersection of West Leland Avenue and

---

[1]A Divvy station is a bicycle share station authorized by the City to allow the public to rent bicycles. Divvy stations are situated at various locations throughout the City. At the time of the accident, plaintiff was riding his own private bicycle—not a Divvy bicycle.

North Western Avenue when he struck a pothole, fell off his bicycle, and sustained permanent injuries. The amended complaint alleged that plaintiff's injuries were directly and proximately caused by several negligent acts or omissions of the City. The City filed an amended motion to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2018)), arguing that it owed plaintiff no duty because plaintiff was not an intended and permitted user of the City's roadway at the accident site. As such, the City maintained that it owed no duty to plaintiff under section 3-102(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/3-102(a) (West 2018)).

¶ 2    The Cook County circuit court granted the City's amended motion to dismiss, finding that, although plaintiff was a permitted user of the subject roadway, he failed to establish that he was an intended user. Thus, the circuit court concluded that the City had no duty to plaintiff pursuant to section 3-102(a) of the Tort Immunity Act. *Id.* The appellate court disagreed, finding that plaintiff was both a permitted and intended user of the roadway and, as a result, the City owed him a duty of reasonable care. 2022 IL App (1st) 210812, ¶ 41. Accordingly, the appellate court reversed the circuit court's judgment and remanded for further proceedings. *Id.* ¶ 43. We now reverse the judgment of the appellate court.

¶ 3                                    I. BACKGROUND

¶ 4                          A. Plaintiff's Amended Complaint

¶ 5    Plaintiff filed his original negligence complaint against the City on October 3, 2019. The operative amended complaint was filed on December 6, 2019, and alleged as follows. At approximately 9 p.m. on June 8, 2019, plaintiff was riding his bicycle on the right side of the roadway and proceeding through a crosswalk at the intersection of West Leland Avenue and North Western Avenue. The area was dark and partially illuminated by artificial lighting. The amended complaint alleged that the City and/or one of its contractors made cuts in the roadway that allowed the infiltration of water, which in turn caused a pothole of significant depth and

width to form on the surface of the roadway.[2] According to the amended complaint, the City had actual knowledge of the condition of the roadway or should have known of the condition by using reasonable diligence and should have repaired the pothole in the roadway where bicycles were known and intended to travel.

¶ 6    The amended complaint further alleged as follows. The City maintained programs to encourage people to ride their own bicycles or to rent Divvy bicycles to ride in the city, and plaintiff was an intended and permitted user of the subject roadway at all relevant times. Moreover, at the time of plaintiff's accident, the City maintained several municipal ordinances applicable to bicycles, including section 9-52-020(b) of the Chicago Municipal Code (Chicago Municipal Code § 9-52-020(b) (amended Apr. 10, 2019)), which, according to the amended complaint, "prohibited bicyclists, such as *** [p]laintiff, who[ ] are over 12 years of age, from riding bicycles upon *any* sidewalk."[3] (Emphasis added.) The amended complaint added that section 9-52-010(a) of the Chicago Municipal Code (Chicago Municipal Code § 9-52-010(a) (amended June 5, 2013)) provided that every bicyclist riding on a city roadway is subject to all the rights and duties of the driver of a vehicle as set forth in the applicable city traffic ordinances or the laws of Illinois declaring the rules of the road.

¶ 7    The amended complaint further alleged that, on the date of plaintiff's accident, a Divvy station approved by the City was situated in the subject area,[4] in addition to signage permitted by the City to advertise bicycle rental. The amended complaint alleged that the City intended for bicycles to be rented and operated on the subject

---

[2]Attached to the original and amended complaints are photographs of the pothole, which the appellate court aptly described as "four to five inches deep at its deepest point, with an inch or so at the bottom filled with loose gravel and debris," and located "approximately four feet from the curb." 2022 IL App (1st) 210812, ¶ 6.

[3]This allegation mischaracterizes section 9-52-020(b) of the Chicago Municipal Code, which in fact conditionally authorizes persons aged 12 and over to ride a bicycle on "any sidewalk along any roadway only if such sidewalk has been officially designated and marked as a bicycle route, or such sidewalk is used to enter the nearest roadway, intersection, or designated bicycle path, or to access a bicycle share station." Chicago Municipal Code § 9-52-020(b) (amended Apr. 10, 2019).

[4]The photograph attached to the original complaint depicts the Divvy station, which is located in a plaza adjoining a sidewalk that runs parallel to the street containing the pothole and crosswalk where the accident occurred. The appellate court aptly described the Divvy station as "about 100 feet away from the pothole." 2022 IL App (1st) 210812, ¶ 7.

roadway by virtue of it allowing the Divvy station to be placed at that location and, as such, the City was under a duty to exercise reasonable care for the safety of permitted and intended users of the roadway, including plaintiff. The amended complaint alleged that the City was guilty of a series of enumerated negligent acts or omissions and, as a direct and proximate result thereof, the front wheel of plaintiff's bicycle struck the pothole, causing him to be thrown from the bicycle and resulting in permanent injuries, including fractured teeth, facial cuts and scars, and injuries to his hip and shoulder.

¶ 8                                B. The City's Amended Motion to Dismiss

¶ 9        On May 17, 2021, the City filed an amended motion to dismiss the amended complaint pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2018)), asserting that it did not intend for bicyclists to use the subject roadway. The City explained that neither Leland Avenue nor Western Avenue nor the intersection of the two was a bicycle route. Nor were there bicycle signs or markings indicating that the City intended for bicyclists to use the roadway at that location. Thus, the City maintained that plaintiff was not an intended user of the subject roadway and, as such, the City owed plaintiff no duty under section 3-102(a) of the Tort Immunity Act. 745 ILCS 10/3-102(a) (West 2018).

¶ 10       The certified statement of David Smith—the projects administrator in the City's department of transportation—was attached as exhibit B to the amended motion to dismiss, pursuant to section 1-109 of the Code. 735 ILCS 5/1-109 (West 2018). In the statement, Smith asserted that the 2019 Chicago Bicycling Map depicted the bicycle routes designated by the City. Pursuant to the map, Smith confirmed that neither the roadway on Leland Avenue nor the roadway on Western Avenue nor the intersection of the two roadways was a designated bicycle route. Smith explained that there are bicycle signs and markings on the roadways the City intends for use by bicyclists and there were no such signs or markings at Leland Avenue, Western Avenue, or near their intersection.

¶ 11       The parties conducted written discovery pertaining to the City's motion to dismiss, which included, *inter alia*, special interrogatories from plaintiff to the City pursuant to Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018). Relevant here, special interrogatory No. 7 inquired: "Is it the expectation of the City of Chicago

that persons using bicycles in the City of Chicago will walk their bicycles at all points when not in a designated bicycle lane?" The City objected to the extent that the question called for a legal conclusion and, without waiving that objection, responded that "it is not the City's expectation that persons using bicycles will walk their bicycles at all points when not in a designated bicycle lane."

¶ 12                           C. Circuit Court's Judgment

¶ 13       On July 6, 2021, the circuit court entered an order dismissing plaintiff's amended complaint with prejudice, finding that, although plaintiff established that he was a permitted user of the roadway, he failed to create a question of fact that he was an intended user of the roadway, resulting in the City owing plaintiff no duty under section 3-102(a) of the Tort Immunity Act (745 ILCS 10/3-102(a) (West 2018)).

¶ 14       The circuit court cited *Wojdyla v. City of Park Ridge*, 148 Ill. 2d 417, 426 (1992) which held that a property's intended use may be determined by looking at the nature of the property, along with *Boub v. Township of Wayne*, 183 Ill. 2d 520, 528-29 (1998), and *Latimer v. Chicago Park District*, 323 Ill. App. 3d 466, 470 (2001), which established that the intended use of a roadway is determined by markings and signage on the roadway as well as other physical manifestations.

¶ 15       The circuit court noted that in this case there were no markings or signs to establish that the City intended for bicyclists to ride on the subject roadway. In addition, the 2019 Chicago Bicycling Map did not designate the subject roadway as a bicycle route.[5] Accordingly, the circuit court found that plaintiff failed to establish that he was an intended user of the subject roadway and, as such, concluded that the City owed plaintiff no duty under section 3-102(a) of the Tort Immunity Act (745 ILCS 10/3-102(a) (West 2018)) and dismissed the amended complaint with prejudice.

---

[5]This portion of the circuit court's order references the map as "the 2018 Chicago Bicycling Map," which is an obvious scrivener's error, as the accident occurred in 2019, the map in the record is the 2019 Chicago Bicycling Map, and the circuit court's order previously and correctly references the map as the "2019 Chicago Bicycling Map."

¶ 16                             D. Appellate Court's Judgment

¶ 17          On appeal, plaintiff argued that a series of factors established that the question of whether he was a permitted and intended user of the roadway and thus whether the City owed him a duty under the Tort Immunity Act was sufficiently unclear at this stage of the proceedings, thus rendering inappropriate the circuit court's judgment granting the City's amended motion to dismiss. 2022 IL App (1st) 210812, ¶ 2.

¶ 18          The appellate court cited section 3-102(a) of the Tort Immunity Act, which provides that a municipality owes a duty of ordinary care to those who are both permitted and intended users of municipal property. *Id.* ¶ 24 (citing 745 ILCS 10/3-102(a) (West 2018)). The appellate court noted that in determining whether the property's use is permitted and intended for purposes of section 3-102(a), courts look to the nature of the property itself. *Id.* ¶¶ 25-26 (citing *Vaughn v. City of West Frankfort*, 166 Ill. 2d 155, 162-63 (1995), *Wojdyla*, 148 Ill. 2d at 425-26, and *Boub*, 183 Ill. 2d at 525). Here, because the parties agreed that plaintiff was a permitted user of the subject roadway, the only issue before the appellate court was whether plaintiff was also an intended user of the roadway. *Id.* ¶ 25.

¶ 19          In looking at the nature of the subject property in this case, the appellate court pointed out that there were no markings or signs to convey any intent for the subject roadway to be used by bicyclists. *Id.* ¶ 32. Yet, the appellate court asserted that the lack of markings alone does not dispose of the claim. *Id.* ¶ 33 (citing *Latimer*, 323 Ill. App. 3d at 470-73). The appellate court also observed cases that looked to a property's customary use to determine its intended use (*id.* ¶ 34 (citing *Wojdyla*, 148 Ill. 2d at 422-23, and *Marshall v. City of Centralia*, 143 Ill. 2d 1, 9-10 (1991)) but noted that custom alone is likewise insufficient to show a particular use is an intended use (*id.* (citing *Boub*, 183 Ill. 2d at 531, and *Sisk v. Williamson County*, 167 Ill. 2d 343, 349 (1995))).

¶ 20          The appellate court further noted that the necessity of a property for a specific purpose similarly does not render the use of that property an intended use. *Id.* ¶ 35 (citing *Wojdyla*, 148 Ill. 2d at 424, *Vaughn*, 166 Ill. 2d at 161-62, and *Sisk*, 167 Ill. 2d at 347). The appellate court qualified, however, that when a particular use is a necessary component of an intended use indicated by the City, that use is likewise intended. *Id.* (citing *Curatola v. Village of Niles*, 154 Ill. 2d 201, 216 (1993) (truck

driver unloading truck lawfully parked in the street was intended user as a necessary extension of the city's intent for vehicles to park there), and *Di Domenico v. Village of Romeoville*, 171 Ill. App. 3d 293, 296 (1988) (plaintiff walking on street to retrieve items from trunk of his legally parked vehicle was intended user)).

¶ 21 In sum, the decisions cited by the appellate court established that no single factor in isolation is sufficient to show that a particular use of property is an intended use. *Id.* ¶¶ 32-35. Here, plaintiff submitted three factors in the appellate court to support his argument that the City intended for bicyclists to use the subject roadway. *Id.* ¶ 36. The first factor was section 9-52-020(b) of the Chicago Municipal Code (Chicago Municipal Code § 9-52-020(b) (amended Apr. 10, 2019)), which, according to the appellate court, "prohibit[ed] adults from riding bicycles on the sidewalk."[6] 2022 IL App (1st) 210812, ¶ 36. Based on the appellate court's characterization of section 9-52-020(b), it cited *Latimer*, 323 Ill. App. 3d at 471, which held that such a prohibition, in and of itself, "does not render a bicyclist an intended user of a roadway." 2022 IL App (1st) 210812, ¶ 36. The *Latimer* court stated: " 'You are prohibited from riding on the sidewalk, and further, you are permitted to ride where we have not prohibited riding.' " *Id.* (quoting *Latimer*, 323 Ill. App. 3d at 471). Applied here, the appellate court indicated that "the ordinance prohibiting riding bicycles on the sidewalks merely narrows the areas in which bicyclists are *permitted* to ride without conveying *intent* that they ride in any particular other area." (Emphases added.) *Id.*

¶ 22 The second factor was the City's response to special interrogatory No. 7 that "it is not the City's expectation that persons using bicycles will walk their bicycles at all points when not in a designated bicycle lane." Plaintiff argued that this "admission" conveyed that the City intended for bicycles to "be ridden in the street, since riding on the sidewalk is illegal[7] and Divvy customers *** are not expected to push their bicycles." *Id.* ¶ 37. The City replied that its response to the interrogatory " 'merely recognizes that it is foreseeable that bicyclists will not

---

[6] Like plaintiff's amended complaint, the appellate court's characterization omits the circumstances expressly set forth in section 9-52-020(b) under which adult bicyclists may ride on any sidewalk—"if such sidewalk has been officially designated and marked as a bicycle route, or such sidewalk is used to enter the nearest roadway, intersection, or designated bicycle path, or to access a bicycle share station." Chicago Municipal Code § 9-52-020(b) (amended Apr. 10, 2019).

[7] Again, this allegation is based on the aforementioned mischaracterization of Chicago Municipal Code section 9-52-020(b).

always walk their bicycles when they are outside of bicycle lanes.' " *Id.* The appellate court indicated that, because " '[f]oreseeability alone *** is not the standard for determining whether a duty of care exists here' [citation], the City's foresight, alone, is insufficient to establish intent on the part of the City." *Id.* (quoting *Wojdyla*, 148 Ill. 2d at 428).

¶ 23    The third factor was the placement of the Divvy station near the accident site. *Id.* ¶ 38. The appellate court cited *Boub*, in which this court concluded that bicyclists—as a whole—were not intended users of the roads in the township in that case. *Id.* ¶ 31. The appellate court recognized that *Boub* was decided long before Divvy stations existed in municipalities and plaintiff here was not arguing that bicyclists—as a whole—were intended users of the City's roadways. *Id.* Rather, plaintiff argued that, because the accident site was in the area of a Divvy station, bicyclists must use the area of the accident site to go to and from the Divvy station. Thus, plaintiff contended that the City permitted and intended for bicyclists to use the subject roadway by virtue of allowing the Divvy station to be placed at that location. *Id.*

¶ 24    In looking at the property itself, the appellate court concluded that it "must necessarily look near to the street as well as to the street itself; otherwise, street signs immediately adjacent to the street would not be relevant indicators." *Id.* ¶ 38 (citing *Wojdyla*, 148 Ill. 2d at 425-26). The appellate court reasoned that, if adjacent signage is a roadway feature relevant to determining the City's intent, so too may "any other factor be a proximate manifestation of intent." *Id.* (citing *Boub*, 183 Ill. 2d at 530). On that basis, the appellate court concluded that "Divvy stations represent an indication of the intended use of the bicycles rented there, as do the streets nearby, and its location implies that bicycles will use the streets and sidewalks adjacent to the Divvy station." *Id.*

¶ 25    The appellate court agreed that, while none of the three factors alone could establish that plaintiff was an intended user of the subject roadway, the three factors in combination, plus the street itself, did establish such intent, thereby resulting in a duty on the part of the City. *Id.* ¶ 39. The appellate court explained that the three factors, combined with the fact that the accident site is in an area where people go to and from the Divvy station, showed "an implied intent" that plaintiff was both a permitted and intended user of the subject roadway. *Id.* The appellate court added

that "the City has approved and generates revenue from a series of bicycle rental stations throughout the city, including one within about 100 feet of where plaintiff's accident took place." *Id.* Accordingly, the appellate court deduced that "the City certainly intends that bicycles be ridden on the roadway in close proximity to the area of the Divvy stations." *Id.*

¶ 26    The appellate court further observed that the 2019 Chicago Bicycling Map depicted "a bicycle lane very close to the [Divvy] station ***, from which one must reasonably infer that the streets in close proximity to the Divvy station are intended paths for bicycle use." *Id.* The appellate court added that "Divvy stations are located throughout the city, and sometimes not near a designated bicycle route." (Internal quotation marks omitted.) *Id.* To that regard, the appellate court asserted that "[i]t defies common sense to suggest that the City, when it approved rental stations at a distance from bicycle lanes, intended bicycles to be pushed a great distance before being ridden, the user's rental period ticking down all the while." *Id.* As such, the appellate court found that "[i]t would be reasonable to conclude that the City intended that bicycles be ridden in the streets adjacent and in close proximity to the stations." *Id.* Accordingly, the appellate court concluded that "[i]t is obviously the City's intent, from all of the factors, that bicycles be ridden in the street at or near the Divvy stations until the rider reaches a designated bicycle path." *Id.*

¶ 27    The appellate court distinguished this case from *Olena v. City of Chicago*, 2022 IL App (1st) 210342-U—the unpublished decision cited by the City for persuasive authority—observing that, here, plaintiff offered evidence of the City's intent due to the accident location being close to the Divvy station, while the plaintiff in *Olena* only offered evidence of statements made by city officials to encourage bicycling. 2022 IL App 1st 210812, ¶ 40 (citing *Olena*, 2022 IL App (1st) 210342-U, ¶¶ 4, 12). While it agreed with *Olena*'s affirming the circuit court's grant of the City's motion to dismiss in that case, the appellate court here "carve[d] out a narrow exception to areas on streets where bicyclists go to and from Divvy stations," which the appellate court concluded "are intended for bicycle traffic." *Id.*

¶ 28    Revisiting its earlier review of necessary use, the appellate court applied the *Curatola* exception and concluded that "riding a bicycle in the area used to get to and from a Divvy station is necessary to its intended use, so that area is intended to be used by all bicyclists." *Id.* ¶ 41 (citing *Curatola*, 154 Ill. 2d at 216). The appellate

court reasoned that, by approving the placement of Divvy stations "far from bicycle lanes," the City knew of the necessity of such use and that bicyclists would ride "in the areas close to the station." *Id.*

¶ 29    The appellate court elaborated:

"Absent any signage directly indicating another intended use of [Divvy] bicycles *** and for so long as an ordinance exists prohibiting adult use of bicycles on sidewalks,[8] it is reasonable to conclude that the City intended the use that common sense, custom, and necessity all indicate: that they be ridden in the streets in close proximity to Divvy stations." *Id.*

¶ 30    The appellate court asserted that "[i]f the City intended that areas in close proximity to Divvy stations are not areas intended for bicycle use, the city council could have passed an ordinance saying that." *Id.* Accordingly, the appellate court concluded that plaintiff was both a permitted and intended user of the roadway where the accident occurred and that the City owed plaintiff a duty of reasonable care. *Id.* Thus, the appellate court reversed the circuit court's dismissal of plaintiff's amended complaint and remanded the matter for further proceedings. *Id.* ¶ 43. This court allowed the City's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021). We later granted leave to Active Transportation Alliance, Illinois Trial Lawyers Association, and Ride Illinois to submit *amicus curiae* briefs in support of plaintiff's position. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 31                                    II. ANALYSIS

¶ 32    The City raises the following sole issue on appeal, which we have restated as follows: whether the circuit court properly dismissed plaintiff's amended complaint based on its finding that the City owed plaintiff no duty under section 3-102(a) of the Tort Immunity Act (745 ILCS 10/3-102(a) (West 2018)). Claims dismissed under section 2-619 of the Code are reviewed *de novo*. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 377 (2003).

---

[8]This once again omits the circumstances under which adults are allowed to ride a bicycle on any sidewalk in the city. See Chicago Municipal Code § 9-52-020(b) (amended Apr. 10, 2019).

¶ 33                                   A. Section 2-619

¶ 34        "The purpose of a section 2-619 motion to dismiss is to dispose of issues of law
and easily proved issues of fact at the outset of litigation." *Id.* at 367. Section 2-
619(a)(9) of the Code allows an involuntary dismissal where "the claim asserted
against defendant is barred by other affirmative matter avoiding the legal effect of
or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2018). " '[A]ffirmative
matter,' in a section 2-619(a)(9) motion, is something in the nature of a defense
which negates the cause of action completely or refutes crucial conclusions of law
or conclusions of material fact contained in or inferred from the complaint." *Illinois
Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994).

¶ 35                           B. Tort Immunity Act Section 3-102(a)

¶ 36        Section 3-102(a) of the Tort Immunity Act provides:

        "[A] local public entity has the duty to exercise ordinary care to maintain its
        property in a reasonably safe condition for the use in the exercise of ordinary
        care of people whom the entity intended and permitted to use the property in a
        manner in which and at such times as it was reasonably foreseeable that it would
        be used, and shall not be liable for injury unless it is proven that it has actual or
        constructive notice of the existence of such a condition that is not reasonably
        safe in reasonably adequate time prior to an injury to have taken measures to
        remedy or protect against such condition." 745 ILCS 10/3-102(a) (West 2018).

¶ 37        In *Monson v. City of Danville,* 2018 IL 122486, ¶ 23, this court noted that
section 3-102(a) "clearly refers to the *plaintiff's* burden to prove the defendant had
actual or constructive notice of the dangerous condition of the property within a
reasonable amount of time to remedy or protect against the condition." (Emphasis
in original.) This court stated that "[i]t is the plaintiff's burden to allege and prove
all of the elements of a negligence claim, including a duty owed by the defendant,
a breach of that duty, and that the breach was the proximate cause of the plaintiff's
injuries." *Id.* This court further noted that, "[u]nder section 3-102(a), actual or
constructive notice of a dangerous condition is an element of a negligence claim."
*Id.* "By contrast, the immunities in the [Tort Immunity] Act are affirmative

defenses, which the defendant has the burden to plead and prove." *Id.* Thus, "if the purpose of section 3-102(a) were to grant immunity to a local public entity, *** the statute would refer to the burden of proof imposed on the *defendant*, not the plaintiff." (Emphasis in original.) *Id.*

¶ 38     "For this reason," "the courts of this state have uniformly held that section 3-102(a) merely codifies the common-law duty of a local public entity to maintain its property in a reasonably safe condition." *Id.* ¶ 24. This court observed:

> " '[T]he language in section 3-102(a) is clear: the city has a duty to maintain its property in a reasonably safe condition so that persons using ordinary care are not harmed. ***
>
> * * *
>
> *** [I]t merely codifies, for the benefit of intended and permitted users, the common law duty of a local public body to properly maintain its roads.' " *Id.* (quoting *Wagner v. City of Chicago,* 166 Ill. 2d 144, 151-52 (1995)).

¶ 39     In *Vaughn*, this court explained that section 3-102(a) "only imposes a duty of ordinary care on municipalities to maintain property for uses that are *both* permitted *and intended*." (Emphases in original.) *Vaughn*, 166 Ill. 2d at 160. Thus, in this case, plaintiff must be both a permitted and intended user of the subject roadway if he is to maintain the litigation against the City. See *Boub*, 183 Ill. 2d at 524. "In truth, an intended user of property is, by definition, also a permitted user; a permitted user of property, however, is not necessarily an intended user." *Id.* In this case, the parties agree that plaintiff was a permitted user of the subject roadway. Accordingly, the remaining question is whether plaintiff was also an intended user of the roadway.

¶ 40     As we examine this issue, we are mindful of the touchstones set forth by this court for determining whether a use of municipal property is an intended use for purposes of section 3-102(a) of the Tort Immunity Act, including looking at the nature of the property itself (*id.* at 525; *Wojdyla*, 148 Ill. 2d at 426; *Vaughn*, 166 Ill. 2d at 162-63) and looking for "affirmative manifestations" (*Boub*, 183 Ill. 2d at 535) such as signs, pavement markings, "and other physical manifestations" (*id.* at 528) to show that the City intends—rather than merely permits—the roadway to be

- 12 -

used in a certain manner. As precedent dictates, this inquiry requires a multifactor analysis on a case-by-case basis and is therefore limited to the facts of each case. See *id.* at 525 (to determine intended use under section 3-102(a), courts look at the nature of the property involved); see also *id.* at 531; *Sisk*, 167 Ill. 2d at 347, 349; *Wojdyla*, 148 Ill. 2d at 424; *Vaughn*, 166 Ill. 2d at 161-62 (single factors in isolation insufficient to show particular use is intended use).

¶ 41                                                    C. Illinois Precedent

¶ 42        This court's precedent governing the intended use of municipal property for purposes of section 3-102(a) of the Tort Immunity Act involved pedestrian use in *Wojdyla*, *Vaughn*, and *Sisk*, then expanded to bicycle use in *Boub*. In these decisions, this court consistently declined to find municipal intent where there were no affirmative manifestations that designated the subject properties for the uses in question.

¶ 43                                                    1. Pedestrian Use

¶ 44        In *Wojdyla*, the plaintiff's decedent was struck by a vehicle while attempting to access his own vehicle by crossing a highway outside any designated crosswalk. *Wojdyla*, 148 Ill. 2d at 420. The plaintiff argued that the decedent was an intended user of that portion of the highway where he was crossing to access his legally parked vehicle and that a duty existed under section 3-102(a) of the Tort Immunity Act for the municipality to provide adequate lighting there. *Id.* at 419, 421.

¶ 45        This court concluded that the decedent was not an intended user of the portion of the highway at the accident site, reasoning as follows:

> "To determine the intended use of the property involved here, we need look no further than the property itself. The roads are paved, marked[,] and regulated by traffic signs and signals for the benefit of automobiles. Parking lanes are set out according to painted blocks on the pavement, signs or meters on the sidewalk or parkway, or painted markings on the curb. Pedestrian walkways are designated by painted crosswalks by design, and by intersections by custom. These are the indications of intended use. That pedestrians may be permitted to

- 13 -

cross the street mid-block does not mean they should have unfettered access to cross the street at whatever time and under whatever circumstances they should so choose. Marked or unmarked crosswalks are intended for the protection of pedestrians crossing streets, and municipalities are charged with liability for those areas. Those areas do not, however, include a highway in mid-block." *Id.* at 426.

¶ 46　　This court applied this same reasoning in *Vaughn*, where the plaintiff was injured after stepping in a hole while crossing a street mid-block. *Vaughn*, 166 Ill. 2d at 157. As in *Wojdyla*, the issue was whether the plaintiff was an intended and permitted user of the street at the accident site, pursuant to section 3-102(a) of the Tort Immunity Act. *Id.* at 158. This court determined that the manner in which an injury occurs is irrelevant in establishing the scope of duty under section 3-102(a), explaining:

"[T]he duty of a municipality depends on whether the *use* of the property was a permitted and intended use. [Citation]. Whether a particular use of property was permitted and intended is determined by looking to the nature of the property itself. [Citation.] The Illinois legislature has expressly limited the duty of a municipality with regard to maintaining its property to a duty of ordinary care to permitted and intended users of the property. Therefore, the question of whether a municipality owes a duty does not depend on whether the plaintiff-pedestrian was struck by a moving vehicle or tripped over a pothole, but rather depends on whether the municipality intended that the plaintiff-pedestrian walk in that part of the street where the injury occurred and permitted the plaintiff-pedestrian to do so." (Emphasis in original.) *Id.* at 162-63.

As we did in *Wojdyla*, this court concluded in *Vaughn* that the plaintiff was not an intended user of the street at the accident site and the city owed no duty because the plaintiff crossed the street where there was no designated crosswalk. *Id.* at 164.

¶ 47　　Subsequently, in *Sisk*, the plaintiff acknowledged the general rule that, because pedestrians are not intended users of streets, municipalities do not owe a duty of reasonable care to pedestrians who walk outside of crosswalks. *Sisk*, 167 Ill. 2d at 347. Yet the plaintiff maintained that an exception to the general rule was warranted for pedestrians who walk on rural country roads. *Id.* at 348. The *Sisk* plaintiff struck a bridge while driving his vehicle then exited his vehicle to survey the damage. *Id.*

at 346. While doing so, the plaintiff fell from the bridge to the creek below and sustained injuries. *Id.* The plaintiff alleged in his complaint that the edge of the pavement was obscured by weeds. *Id.* This court held that the county defendant owed no duty under section 3-102(a), reasoning as follows:

> "[T]here are no such manifestations to indicate that Williamson County intended pedestrians to walk on its country roads, much less the specific road and bridge complained of by plaintiff in the case at bar. As the appellate court noted, there are no walkways or crosswalks on rural country roads such as the county-line road in this case. Further, many country roads are gravel roads and often have no shoulder. We believe that the inference to be drawn from these facts, if any, is that municipalities do not intend that pedestrians walk on rural country roads. Although it may become necessary at times for pedestrians to walk on country roads, such use is not a manifestation of the local municipality's intent that pedestrians walk on its country roads or an undertaking by the municipality to make country roads free from defects that might injure pedestrians." *Id.* at 351-52.

Adhering to precedent, this court concluded that, due to a lack of manifestations of intent for pedestrians to use the roadway and bridge at the accident site, plaintiff was not an intended user and the county was therefore not liable. *Id.*

¶ 48                                    2. Bicycle Use

¶ 49        The principles established by this court in the decisions involving pedestrian use were subsequently applied to bicycle use in *Boub*, 183 Ill. 2d at 528. In *Boub*, the plaintiff's accident occurred while he was riding his bicycle across a one-lane bridge on a township road. *Id.* at 522. The plaintiff was thrown from his bicycle and injured when his front tire got stuck in the planks on the surface of the bridge. *Id.*

¶ 50        Observing *Wojdyla*, *Vaughn*, and *Sisk*, this court stated that "it is necessary to look at pavement markings, signs, and other physical manifestations of the intended use of the property." *Id.* at 528. This court observed that, just as the presence or absence of signs and pavement markings is relevant in determining whether pedestrians are intended users of roadways, so is the presence or absence of signs

and pavement markings relevant in determining whether the plaintiff as a bicyclist was an intended user of the roadway and bridge at the accident site. *Id.*

¶ 51    This court noted that there were no affirmative manifestations such as signs or special pavement markings to indicate that the township intended—as opposed to merely permitted—bicyclists to use the bridge and roadway at the accident site. *Id.* at 528, 535. Accordingly, this court concluded that the plaintiff was not an intended user and there was no question of fact to preclude summary judgment that was entered in favor of the defendants. *Id.* at 536.

¶ 52                                    3. Divvy Stations

¶ 53    Plaintiff asserts that the instant case presents a matter of first impression in Illinois, namely the application of section 3-102(a) of the Tort Immunity Act to "the expanded use of bicycles and bicycle rentals in the modern era, that did not exist at the time this [c]ourt issued its opinion in *Boub*." He adds that the presence of the Divvy station and its accompanying sign distinguish the instant case from this court's precedents and the City's cited cases, claiming that the conclusions in those decisions would have differed had the municipalities there been advertising bicycle rental or renting out bicycles at the accident locations. *Amici* likewise highlight the evolution of bicycling since *Boub* and urge that Illinois precedent is not commensurate with the modern bicycle culture.

¶ 54    It is true that, when this court issued its decision in *Boub*, bicycle rentals did not exist as they do today. Yet the modern presence of Divvy stations does not alter the fundamentals of our established precedent—it merely incorporates a new factor into the requisite multifactor analysis for determining the intended use of municipal property by looking at the nature of the property involved.

¶ 55                                D. Nature of the Property

¶ 56    Guided by our precedent, to determine the City's intended use of the subject roadway in the instant case, we look at the nature of the property. See *id.* at 525; *Wojdyla*, 148 Ill. 2d at 426; *Vaughn*, 166 Ill. 2d at 162-63. In doing so, we must look for "affirmative manifestations" (*Boub*, 183 Ill. 2d at 535) such as signs,

pavement markings, "and other physical manifestations" (*id.* at 528) of the intended use of the property.

¶ 57    The City stresses that it uses signs and pavement markings to "make it abundantly clear what areas, specifically, are intended for bicycling" and that the appellate court should have ended the inquiry when it recognized that the roadway in question bore no such signs or markings, which established that no duty was owed to keep the subject roadway in a reasonably safe condition for bicycling. Plaintiff responds that the presence of the nearby Divvy station and the large Divvy sign advertising bicycle rental are affirmative manifestations that the City intended for bicycles to be used at the accident location.

¶ 58    Notably, both parties focus primarily on a single factor. Because courts look at the presence or absence of signs and pavement markings to determine whether a municipality intends for a roadway to be used for bicycling, the City's focus on the lack of signs and pavement markings is relevant in this case. See *id.* However, we disagree that the inquiry should end there because courts also look at "*other physical manifestations* of the intended use of the property," which extend beyond the mere presence or absence of road signs and pavement markings. (Emphasis added.) *Id.*; see also *Wojdyla*, 148 Ill. 2d at 425-26 (in addition to signs, courts look at roads, curbs, traffic signals, and meters on the sidewalk or parkway). Here, the Divvy station and Divvy sign are factors relevant to the nature of the property involved. Thus, we must determine whether they constitute "other physical manifestations" that the City intended bicycling as a use of the roadway in this case. Therefore, plaintiff's focus on the Divvy station and sign is equally relevant.

¶ 59    Plaintiff asserts that he "is not suggesting that the Divvy station alone is the basis for liability," yet he markedly dedicates the bulk of his arguments to the significance of the presence of the Divvy station. The two factors highlighted by the parties are well taken, but because looking at the nature of the property to determine the City's intended use of that property is a multifactor inquiry, we incorporate those factors with several others that are also pertinent to the nature of the subject property in the instant case.

¶ 60                       E. Affirmative Physical Manifestations

¶ 61        Here, the record reflects that there are no street signs or pavement markings designating the subject roadway as a bicycle lane. The surface of the roadway is marked with a painted crosswalk running perpendicularly to the direction plaintiff was traveling. The pothole that plaintiff struck was located at the south end of the crosswalk approximately four feet from the curb. The north end of the crosswalk borders a sidewalk that runs parallel to the subject roadway. A Divvy station is located in a plaza adjacent to and north of the sidewalk, approximately 100 feet from the accident site, along with a Divvy sign advertising bicycle rental. A bicycle rack is situated in the same plaza and sits just east of the Divvy station. The 2019 Chicago Bicycling Map depicts the nearest bicycle lane on Lincoln Avenue, which the City avers is one block from the accident site. The appellate court confirmed that the map depicts the "bicycle lane very close to the [Divvy] station." 2022 IL App (1st) 210812, ¶ 39. These facts are undisputed.

¶ 62                                  1. Roadway

¶ 63        The amended complaint alleges that the accident occurred when plaintiff was "riding his bicycle on the right side of the roadway, entering the intersection in the area of Leland and Western, in a crosswalk" when he struck the pothole. Photographs in the record establish that plaintiff was traveling east on West Leland Avenue when the accident occurred. The photographs further confirm that the pothole was located on the surface of the roadway at the south end of the crosswalk that was painted across West Leland Avenue.

¶ 64                 2. Chicago Municipal Code Section 9-52-010(a)

¶ 65        At this point, we address section 9-52-010(a) of the Chicago Municipal Code, which plaintiff cites to support his argument that the City intended bicycling as a use of the roadway at the accident site. Section 9-52-010(a) governs the rights and duties of bicyclists traveling on city streets. As such, this ordinance applies to the subject roadway in this case. Section 9-52-010(a) provides:

"Every bicyclist upon a roadway shall be granted all of the rights and shall be subject to all of the duties applicable to the driver of a vehicle by the laws of this state declaring rules of the road applicable to vehicles or by the traffic ordinances of this city applicable to the driver of a vehicle, except as otherwise explicitly provided in this Code, or as to those provisions of laws and ordinances which by their nature can have no application." Chicago Municipal Code § 9-52-010(a) (amended June 5, 2013).

¶ 66        Plaintiff contends that, under this ordinance, he is subject to "all of the rights" of a motorist, including "the right to be free from negligence" and the right to be an intended user of the roadway at the accident location. We disagree. Plaintiff conflates intended use with permitted use. Intended use is narrower than permitted use. Just because a bicyclist is *permitted* to use a city street does not mean that he or she is *intended* to use it. Section 9-52-010(a) grants bicyclists the same rights and subjects them to the same duties as motorists pursuant to municipal ordinances and state laws declaring the rules of the road. Implicit in this ordinance is that bicyclists are *permitted* to use any roadway in the city that motorists are permitted to use. This does not mean that the City *intended* bicyclists to use every roadway in the city that motorists are intended to use.

¶ 67        Precedent has accentuated the difference between permitted use and intended use for purposes of section 3-102(a) of the Tort Immunity Act, and we find that distinction applicable here. Again, intended use is narrower than permitted use in light of the duty accompanying intended use. This court emphasized in *Vaughn* that intended use of municipal property must be limited in light of the duty to keep the property reasonably safe. This court asserted—in the context of pedestrian use— that "the Illinois legislature has established a clear public policy to immunize government from the financial burdens of preventing injuries which occur as a result of unintended uses of the streets." *Vaughn*, 166 Ill. 2d at 164. The *Vaughn* court reasoned that "[t]he costs of making all public streets and roadways reasonably safe for unrestricted pedestrian use would be an extreme burden on municipalities with limited resources" and that "imposing such a burden with regard to streets and roadways in their entirety would be unduly expensive and burdensome." *Id.* Though *Vaughn* involved pedestrian use, its principles are equally applicable to bicycle use, as the duty of exercising ordinary care to keep

property intended for bicycling in a reasonably safe condition must be limited for the same reasons set forth in *Vaughn.*

¶ 68 Plaintiff maintains that Chicago Municipal Code section 9-52-010 gives him the right to be an intended user of the accident location. This court addressed this argument in *Boub* in the context of section 11-502 of the Illinois Vehicle Code, which contains nearly identical provisions regarding the rights and duties of bicyclists: " '[e]very person riding a bicycle upon a highway shall be granted all of the rights and shall be subject to all of the duties applicable to the driver of a vehicle by this Code.' " *Boub*, 183 Ill. 2d at 529 (quoting 625 ILCS 5/11-1502 (West 1996)).

¶ 69 In *Boub*, this court stressed that, under section 3-102(a) of the Tort Immunity Act, it is the intent of the *local* municipality that controls as opposed to that of the state or any other entity. *Id.* Yet to whatever extent the Illinois Vehicle Code was relevant, this court disagreed that section 11-502 supported a conclusion that bicyclists are—like drivers of vehicles—intended *and* permitted users of Illinois highways and streets. *Id.* This court reasoned that the section was apparently designed to ensure that bicyclists obey traffic laws while riding on public highways and streets. *Id.* at 529-30. Accordingly, this court concluded that the provision was "entirely consistent with the conclusion that bicyclists are permitted, but not intended, users of the roads, in the absence of specific markings, signage, or further manifestation of the local entity's intent that would speak otherwise." *Id.* at 530.

¶ 70 Here, though plaintiff cites section 9-52-010 of the Chicago Municipal Code as opposed to section 11-502 of the Illinois Vehicle Code that was cited in *Boub*, we note the provisions of these two enactments are virtually identical. As such, our conclusion in *Boub* applies here. Adhering to our reasoning in *Boub*, we find that section 9-52-010 of the Chicago Municipal Code ensures that bicyclists will obey traffic laws while riding on city streets. Thus, we find that section 9-52-010 supports the conclusion that bicyclists are permitted—but not intended—users of the city streets, "in the absence of specific markings, signage, or further manifestation of the [City's] intent that would speak otherwise." See *id.*

## 3. Signs and Markings

As stated, there are no signs or pavement markings designating Leland Avenue or Western Avenue as a bicycle lane. We agree with the City that this indicates that it did *not* intend for bicycling as a use of the roadway. See *id.* at 528. Yet the lack of markings alone does not dispose of the claim, as there are other factors in this case that are relevant to the nature of the subject property. See *id.* at 525, 531; *Sisk*, 167 Ill. 2d at 347, 349; *Wojdyla*, 148 Ill. 2d at 424; *Vaughn*, 166 Ill. 2d at 161-62; *Latimer*, 323 Ill. App. 3d at 470-73. Accordingly, we address those other factors.

## 4. Crosswalk

While the crosswalk at the accident site is relevant to the nature of the property, it has no bearing on the issue of whether the City intended for bicycling to be used on the subject roadway. The Chicago Municipal Code distinguishes bicyclists from pedestrians (Chicago Municipal Code § 9-4-010 (amended July 21, 2021)), as did this court in *Boub*, 183 Ill. 2d at 528. As such, the appellate court properly acknowledged that, "even if the City owed a duty to pedestrians to maintain the crosswalk ***, bicyclists are not pedestrians, and there is no authority to support the proposition that [such] duty extends to bicyclists." 2022 IL App (1st) 210812, ¶ 27. Furthermore, plaintiff was not using the crosswalk, as he was riding his bicycle perpendicularly across it. For these reasons, the presence of the crosswalk has no impact on whether plaintiff was an intended user of the subject roadway.

## 5. Divvy Station and Divvy Sign

We next observe the Divvy station, its accompanying sign located in the plaza adjoining the sidewalk that runs parallel to West Leland Avenue, and what those convey regarding the City's intended use of West Leland Avenue. At the outset, we note that plaintiff was not riding a Divvy bicycle but his privately owned bicycle. However, the appellate court indicated that, because the City "made no explicit pronouncement of intent with regard to Divvy renters in particular, we find no reason to conclude that the City's intent is limited to bicyclists renting from Divvy stations." *Id.* ¶ 41. Assuming without deciding that any intent the City would have regarding the use of Divvy bicycles at this particular property would equally apply

to the use of private bicycles, we consider the placement of the Divvy station and sign.

¶ 77    The Divvy station is a topic of extensive discussion among the parties as well as the appellate court. We begin with a recitation of the appellate court's conclusions regarding the Divvy station, which we find problematic. At the outset, we reiterate that determining the intended use of municipal property is a case-by-case analysis, as examining the nature of the property involved is a fact-specific inquiry, given the uniqueness of each property. See *Boub*, 183 Ill. 2d at 525. Accordingly, a proper analysis is contextually limited to observing the specific property involved in the accident. In this case, however, the appellate court repeatedly made observations, cited facts, and drew conclusions exceeding that scope.

¶ 78    Besides mentioning the Divvy station near the accident site in the instant case, the appellate court added that "the City has approved and generates revenue from a series of bicycle rental stations throughout the city." 2022 IL App (1st) 210812, ¶ 39. As such, the appellate court concluded that "the City certainly intends that bicycles be ridden on the roadway in close proximity to the area of the Divvy stations." *Id.* The error in this conclusion is twofold. First, the appellate court crafted a general rule regarding the City's intended use and applied it to every roadway in the city that is in the vicinity of a Divvy station, thereby violating the requirement to limit its inquiry to the nature of the particular property involved. Second, the appellate court derived this conclusion from the fact that the City approves Divvy stations and profits financially from Divvy rentals. These facts are irrelevant to the issue, as they merely provide ancillary information regarding the Divvy program and improperly suggest an alternative basis for liability other than the City's intended use of the subject roadway in the instant case. Though the City's financial profit may suggest a motive for placing the Divvy station at this location, we do not agree that it establishes that the City intended bicycling at the accident site on West Leland Avenue. Accordingly, we reject these arguments and those similarly advanced by plaintiff.

¶ 79    The appellate court further observed that the 2019 Chicago Bicycling Map illustrated "that there is a bicycle lane very close to the rental station cited by plaintiff, from which one must reasonably infer that the streets in close proximity

to the Divvy station are intended paths for bicycle use."[9]  *Id.* This statement aptly pertains to the nature of the specific property in question here. However, immediately after making this statement, the appellate court once again expanded its analysis to areas beyond the relevant property, observing that the 2019 Chicago Bicycling Map also illustrated—and the City admitted in its brief—that "Divvy stations are located throughout the city, and sometimes not near a designated bicycle route." (Internal quotation marks omitted.) *Id.*

¶ 80    Having so observed, the appellate court further commented on areas outside the property in the instant case: "It defies common sense to suggest that the City, when it approved rental stations at a distance from bicycle lanes, intended bicycles to be pushed a great distance before being ridden, the user's rental period ticking down all the while." *Id.* Though Divvy stations far from bicycle lanes have nothing to do with the nature of the property in the instant case, that was yet the premise on which the appellate court based its finding that "[i]t would be reasonable to conclude that the City intended that bicycles be ridden in the streets adjacent and in close proximity to the stations." *Id.* The appellate court correspondingly concluded that "[i]t is obviously the City's intent, from all of the factors, that bicycles be ridden in the street at or near the Divvy stations until the rider reaches a designated bicycle path." *Id.*

¶ 81    As with the aforementioned conclusion, these statements are inapplicable to the nature of the property involved in this case, as they apply generally to Divvy stations in the city that are situated far from bicycle lanes.[10]  We add that—though inapplicable to the property in the instant case—the appellate court's hypothetical of remote Divvy stations and its accompanying insinuations regarding the City's intent for bicycles to be pushed great distances contradict the City's response to special interrogatory No. 7 that "it is not the City's expectation that persons using bicycles will walk their bicycles at all points when not in a designated bicycle lane."[11]

---

[9]We also find this conclusion erroneous, which we discuss in detail, *infra*.

[10]This is not to say that—in the event that a bicycle accident occurs on a street near a Divvy station with no nearby bike lane—this would not be an affirmative physical manifestation of intended use, as the City's liability is determined on a case-by-case basis.

[11]We address the response to this interrogatory in greater detail, *infra*.

¶ 82    The appellate court drew yet another general conclusion that exceeded the requisite scope of inquiry after distinguishing the facts of this case from *Olena*. *Id.* ¶ 40 (citing *Olena*, 2022 IL App (1st) 210342-U). Though the appellate court agreed with the decision in *Olena*, which affirmed the dismissal of the plaintiff's complaint in that case it "carve[d] out a narrow exception to areas on streets where bicyclists go to and from Divvy stations" and concluded that "these areas are intended for bicycle traffic." *Id.* This conclusion erroneously applies generally to all roadways in the vicinity of Divvy stations throughout the City.

¶ 83    The appellate court next considered any necessity of a given use and acknowledged that necessity does not in and of itself render that use intended. *Id.* ¶ 35. However, the appellate court noted the exception when a particular use is a necessary component of an intended use and again expanded its discussion from the specifics of the property involved in this case to Divvy stations in general throughout the city:

> "Much as stepping into the street to move to and from one's vehicle was a necessary intended use attendant to the marked intended use of parking vehicles in *Curatola*, riding a bicycle in the area used to get to and from a Divvy station is necessary to its intended use, so that area is intended to be used by all bicyclists." *Id.* ¶ 41 (citing *Curatola*, 154 Ill. 2d at 216).

¶ 84    Applying *Curatola* to this case, the appellate court asserted that, "[w]hen the City approved the locations of Divvy stations *far from bicycle lanes*, it was aware that necessity would dictate such use, and it had knowledge that bicyclists would be riding their bicycles in the areas close to the station." (Emphasis added.) *Id.* These assertions have no application here, as the property involved in this case contains a Divvy station that is "very close" to a bicycle lane. See *id.* ¶ 39.

¶ 85    Plaintiff also implicates necessity, arguing that "by renting that bicycle in an area without bicycle lanes, by necessity and common practice" and "[b]y compelling riding the bicycle on the street[ ] in the area of this incident, the City has demonstrated its intent." Plaintiff explains that a Divvy station symbolizes bicycle use and, if the City did not intend for bicycles to be used at the accident site, it should not rent bicycles there but only place them where bicycle lanes are located.

- 24 -

¶ 86    The City disagrees that "riding a bicycle in the area used to get to and from a Divvy station is necessary to its intended use" (*id.* ¶ 41) and contends that the appellate court inappropriately applied *Curatola* to this case. Plaintiff urges that the appellate court did not extend *Curatola*, maintaining that decision is limited to the context of pedestrians using the street around parked vehicles. We agree with the City that the appellate court likened this case to *Curatola* and improperly extended its principles here.

¶ 87    In *Curatola*, a pedestrian was injured when he stepped from his legally parked semitruck into a pothole on the street below. *Curatola*, 154 Ill. 2d at 203-04. This court acknowledged the general rule that a municipality owes no duty to a pedestrian who uses streets outside of crosswalks. *Id.* at 208. However, this court recognized a "narrow exception" was warranted and found a pedestrian's "use of the street immediately around a legally parked vehicle by its exiting and entering operators and occupants" is both a permitted and intended use. *Id.* at 213. To provide a definitive context of this narrow exception, the *Curatola* court made clear that the area "immediately around" a legally parked vehicle where pedestrian use is intended and permitted "will be bounded by the parameters of the parking lanes." *Id.* at 214. Here, the appellate court violated the boundaries of *Curatola*'s "narrow exception" by extending it to the context of riding bicycles in areas near Divvy stations. See 2022 IL App (1st) 210812, ¶ 41. Plaintiff concedes "that a *Curatola*-type exception does not translate to this case." We agree and find that the underlying "necessity" exception in *Curatola* has no application here.

¶ 88    Though plaintiff concedes that *Curatola* does not apply, he persists that a Divvy station necessitates bicycle use. However, the question here is not whether a Divvy station renders bicycle use necessary but whether the City intended bicycling as a use of the subject roadway in this case, which happens to be in the vicinity of a Divvy station. Accordingly, assuming that bicycle use is necessarily associated with the Divvy station, that has no effect on the question of whether the City intended bicycling as a use of the roadway at the accident site.

¶ 89    In concluding our discussion of necessity, we now revisit the appellate court's assertion "that there is a bicycle lane very close to the rental station cited by plaintiff, from which one must reasonably infer that the streets in close proximity to the Divvy station are intended paths for bicycle use." *Id.* ¶ 39. We disagree. The

bicycle path—which *is* intended for bicycle use—is "very close" to the Divvy station and provides bicyclists a safe means of travel other than "the streets in close proximity to the Divvy station." *Id.* Moreover, bicyclists may ride on the sidewalk adjacent to the Divvy station to access the nearby bicycle lane and the Divvy station itself (see Chicago Municipal Code § 9-52-020(b) (amended Apr. 10, 2019)),[12] thus further obviating the need to ride bicycles on the adjacent West Leland Avenue and removing necessity from the equation.

¶ 90    Finally, we observe the parties' arguments regarding the Divvy station and the implications thereof on the scope of duty under section 3-102(a) of the Tort Immunity Act. The City maintains that the Divvy station does not provide "clear visual cues to specify its intent with respect to specific property" and, as such, a person cannot observe the Divvy station and understand precisely where bicycling is intended. The City elaborates that a judicially crafted area of duty "around a Divvy station" is arbitrary, as no discernible radius may be established to govern where the City's duty begins and ends, resulting in an enormous burden to ensure that a particular property is reasonably safe for bicycling.

¶ 91    In support, the City points to the appellate court's consistent inability to clearly describe the roadways the City allegedly intended for bicycle use. See 2022 IL App (1st) 210812 ¶ 38 ("the streets and sidewalks adjacent to the Divvy station"); *id.* ¶ 39 ("the streets in close proximity to the Divvy station"); *id.* ("the roadway in close proximity to the area of the Divvy stations"); *id.* ("the street at or near the Divvy stations until the rider reaches a designated bicycle path"); *id.* ¶ 40 ("streets where bicyclists go to and from Divvy stations"); *id.* ¶ 41 ("the area used to get to and from a Divvy station"); *id.* ("the areas close to the station"). The City maintains that, due to the inability to establish a clear scope of duty, the Divvy station is not an affirmative manifestation that the City intended bicycling as a use of the subject roadway.

¶ 92    Plaintiff disagrees that the appellate court's comments create a vague obligation, claiming that the comments merely reinforce the necessity to look at the nature of a specific property on a case-by-case basis. Plaintiff explains that, "[i]f the City wants to know its area of obligations, the [appellate court] clearly

_____

[12]We further discuss this ordinance, *infra*.

- 26 -

instructed it to look at the areas where it rents bicycles through these stations." We agree with the City.

¶ 93        The inability to precisely define the radius of intended bicycle use "near a Divvy station" is coupled with an impossibility for the City to discern where its duty lies to maintain a property in a reasonably safe condition for bicycling. Section 3-102(a) of the Tort Immunity Act allows the City to control its scope of duty by governing what uses it intends for specific properties. This reinforces why—for purposes of section 3-102(a) of the Tort Immunity Act—intended use is measured by the *City's* intent (see *Boub*, 183 Ill. 2d at 525; 745 ILCS 10/3-102(a) (West 2018)) and exemplifies why a judicially selected area of duty would conflict with that requirement. The need for a definitive and limited scope of duty furthers our earlier discussion of the importance of distinguishing between permitted and intended use. See *Vaughn*, 166 Ill. 2d at 164 (intended use of municipal property must be limited considering the corresponding duty to keep the property reasonably safe).

¶ 94        In summary, the Divvy station and Divvy sign are factors to consider when observing the nature of the property involved in this case. However, for the said reasons, we find that—assuming private bicycle use is to be treated the same as Divvy bicycle use for the purpose of analyzing the City's intent—the Divvy station and sign establish only that the City *permitted* bicycling as a use of the adjacent West Leland Avenue. "[I]n the absence of *** further manifestation of the [City's] intent that would speak otherwise" (*Boub*, 183 Ill. 2d at 530), we conclude that the Divvy station and sign are not affirmative physical manifestations that the City *intended* bicycling as a use of West Leland Avenue at the accident site.

¶ 95                                                6. Sidewalk

¶ 96        We next observe the sidewalk located alongside West Leland Avenue where the accident occurred. The sidewalk runs east and west between West Leland Avenue and the plaza where the Divvy station is situated and adjoins the north end of the crosswalk containing the pothole.

¶ 97                    a. Chicago Municipal Code Section 9-52-020(b)

¶ 98        Section 9-52-020(b) of the Chicago Municipal Code governs bicycle use on sidewalks and therefore applies to the sidewalk in the instant case. That section provides that

> "a person 12 or more years of age may ride a bicycle upon any sidewalk along any roadway only if such sidewalk has been officially designated and marked as a bicycle route, *or* such sidewalk is used to enter the nearest roadway, intersection, or designated bicycle path, or to access a bicycle share station." (Emphasis added.) Chicago Municipal Code § 9-52-020(b) (amended Apr. 10, 2019).

¶ 99        As noted, the appellate court and plaintiff both repeatedly mischaracterized this ordinance by omitting the express circumstances under which bicyclists may in fact ride on sidewalks. Though section 9-52-020(b) does not allow unlimited bicycle use of the sidewalk, it *does* allow bicyclists to use the sidewalk to access the nearest bicycle lane, roadway, intersection, or Divvy station. See *id.* Thus, bicyclists— including plaintiff—are not categorically prohibited from riding on the subject sidewalk in this case.

¶ 100       Plaintiff asserts that, although section 9-52-020(b) is not sufficient by itself to establish intent, that section combined with other factors does establish intent. The appellate court similarly concluded that

> "[a]bsent any signage directly indicating another intended use of bicycles rented from city-approved rental stations *and for so long as an ordinance exists prohibiting adult use of bicycles on sidewalks*, it is reasonable to conclude that the city intended the use that common sense, custom, and necessity all indicate: that they be ridden in the streets in close proximity to Divvy stations." (Emphasis added.) 2022 IL App (1st) 210812 ¶ 41.

¶ 101       We disagree, noting that implicating section 9-52-020(b) in this manner again conflates intended use with permitted use. Even assuming, *arguendo*, that section 9-52-020(b) did impose a categorical ban of bicycling on sidewalks, such a ban would not establish that the City intended bicycling as a use of West Leland Avenue at the accident site in this case. The City argues—and we agree—that "[a]

prohibition against bicycle use at one location (the sidewalk) is irrelevant to the City's intent at a different location (the street)." The appellate court aptly summarized this concept, asserting that "the ordinance prohibiting riding bicycles on the sidewalks merely narrows the areas in which bicyclists are *permitted* to ride without conveying *intent* that they ride in any particular other area." (Emphases added.) *Id.* ¶ 36. We agree.

¶ 102 Section 9-52-020(b) implicates *permitted* use as opposed to *intended* use, as it expressly sets forth the conditions under which a bicyclist "*may ride*" on a sidewalk. (Emphasis added.) Chicago Municipal Code § 9-52-020(b) (amended Apr. 10, 2019). It follows that any lack of permitted use of bicycles on the sidewalk does not establish any intended use of bicycles on the roadway at the accident site. Accordingly, we conclude that this ordinance does not establish that the City intended bicycle use on West Leland Avenue.

¶ 103                                 7. Bicycle Rack

¶ 104 A bicycle rack is situated in the plaza adjoining the sidewalk and sits east of the Divvy station. The City compares the bicycle rack to the Divvy station, as both facilitate bicycling in the city. Plaintiff responds that bicycle racks are not comparable to Divvy stations but makes no argument regarding the impact of the bicycle rack on the City's intended use of West Leland Avenue. Moreover, the appellate court's opinion is devoid of any mention of the bicycle rack. Although the bicycle rack is an observable factor relevant to the nature of the property involved, it does not constitute an affirmative physical manifestation of intent regarding whether plaintiff was an intended user of the accident site here and has no bearing on our analysis.

¶ 105                         F. Special Interrogatory No. 7

¶ 106 Special interrogatory No. 7 inquired: "Is it the expectation of the City of Chicago that persons using bicycles in the City of Chicago will walk their bicycles at all points when not in a designated bicycle lane?" The City responded: "[I]t is not the City's expectation that persons using bicycles will walk their bicycles at all points when not in a designated bicycle lane."

¶ 107    In reference to this interrogatory, the City asserts that bicyclists may either walk or ride their bicycles and the City has no reason to expect a bicyclist to choose one over the other. The City adds that, even in areas where bicycling is not intended, "bicyclists are still permitted to ride on the street at their own risk." Thus, the City contends that its lack of expectation that a rider would walk his or her bicycle does not support a conclusion that it intends bicycling as a use of any street that is not specifically designated for that purpose.

¶ 108    The City argues that, at most, its response to the interrogatory suggests that it is *foreseeable* that bicyclists will ride on the street. The appellate court considered the City's response to the interrogatory and concluded that, because " '[f]oreseeability alone *** is not the standard for determining whether a duty of care exists here' [citation], the City's foresight, alone, is insufficient to establish intent on the part of the City." 2022 IL App (1st) 210812, ¶ 37 (quoting *Wojdyla*, 148 Ill. 2d at 428).

¶ 109    The City points out that the appellate court's comment on foreseeability suggests that foreseeable use may be combined with other factors to establish intent, but no case supports doing so. Rather, the City contends that foreseeability has no relevance to intended use of its property but, rather, is a separate requirement for establishing a duty under section 3-102(a) of the Tort Immunity Act. The City reasons that, under the plain language of section 3-102(a), "intended and permitted" use is one requirement to establish a duty and the other requirement is that the "manner" of the intended use must be "reasonably foreseeable." See *id.* Accordingly, the City argues that foreseeability is an additional requirement to establishing a duty rather than a means of proving that a use was intended. We agree.

¶ 110    This court has established that intended use and permitted use are separate requirements from foreseeable use for purposes of section 3-102(a). See *Wojdyla*, 148 Ill. 2d at 428 (duty under section 3-102(a) not based solely on intended and permitted foreseeable users, but also on foreseeable users). This court further established that custom and historical practice do not establish bicycling as intended use of property. See *Boub*, 183 Ill. 2d at 531. Because bicyclists by custom and historical practice ride on city streets that are not designated as bicycle lanes, such use is foreseeable, but that does not support a conclusion that the City intends

bicycling as a use at such locations. For these reasons, we find the City's response to the interrogatory has no impact on our analysis, as it involves foreseeable use, which is separate from the issue of the City's intended use of West Leland Avenue.

¶ 111                                    G. Other Considerations

¶ 112     Finally, we find noteworthy the appellate court's assertion that, "[i]f the City intended that areas in close proximity to Divvy stations are not areas intended for bicycle use, the city council could have passed an ordinance saying that." 2022 IL App (1st) 210812, ¶ 41. We reiterate that the accurate measure of intended use is to observe "affirmative manifestations." The appellate court's stated approach erroneously measures intent by the absence of an indicator of intent, *i.e.*, the lack of an ordinance stating that bicycle use on streets near Divvy stations is unintended. The City contends—and we agree—that "it defies all common sense to suggest that non-expression of a non-intended use is relevant to show what use is intended." The City suitably summarizes that "[s]ection 3-102(a) has never been—and should not now be—read to impose an onerous and impractical burden on municipalities to enact ordinances enumerating myriad uses that are unintended."

¶ 113                                    III. CONCLUSION

¶ 114     After considering all of the factors relevant to the nature of the property involved in this case, for the foregoing reasons, we conclude that bicycling was not both a permitted and intended use of the subject roadway at the accident site. As such, the City did not owe plaintiff a duty of reasonable care under section 3-102(a) of the Tort Immunity Act, thus rendering appropriate the circuit court's judgment granting the City's amended motion to dismiss plaintiff's amended complaint under section 2-619 of the Code. See *Vaughn*, 166 Ill. 2d at 162. Accordingly, we reverse the judgment of the appellate court and affirm the circuit court's judgment granting the City's amended motion to dismiss plaintiff's amended complaint and dismissing the amended complaint with prejudice.

¶ 115     Appellate court judgment reversed.

¶ 116          Circuit court judgment affirmed.