2025 IL App (1st) 221788-U

SECOND DIVISION
May 13, 2025

No. 1-22-1788

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| SEBASTIAN KO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 L 10032 |
| | ) | |
| THE CITY OF CHICAGO, a municipal corporation, | ) | |
| | ) | |
| Defendant-Appellant | ) | |
| | ) | |
| (T.Y. LIN INTERNATIONAL GREAT LAKES, INC., | ) | |
| a California corporation, | ) | Honorable |
| | ) | Thomas V. Lyons, II, |
| Defendant.) | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

ORDER

¶ 1    *Held*:   We affirm the judgment of the circuit court of Cook County denying defendant's motion for a judgment notwithstanding the verdict; the parties presented conflicting evidence that the nature of the property showed defendant's intent that a bicyclist was an intended user of a "buffer zone" adjacent to a bike lane, and the evidence did not overwhelming preponderate in defendant's favor; therefore, judgment notwithstanding the verdict was properly denied.

¶ 2    Plaintiff, Sebastian Ko, was injured when he rode his bicycle into an area of the roadway separating vehicular traffic from a designated bike lane (the "buffer zone") and collided with a broken flexible post in the buffer zone. Plaintiff filed a complaint for negligence against

defendant, the city of Chicago. Following a jury trial, the jury entered a verdict in favor of plaintiff and against the city. The city filed a motion for a judgment notwithstanding the verdict (j.*n.o.v.*) on the ground the city did not owe a duty to plaintiff because plaintiff was not an intended user of the area in which he was injured. The trial court denied the city's posttrial motion, and the city appealed. For the following reasons, we affirm.

¶ 3                                     BACKGROUND

¶ 4      On April 18, 2022, plaintiff, Sebastian Ko, filed a third amended complaint against defendants, the city of Chicago and T.Y. Lin International Great Lakes, Inc., a California corporation (Great Lakes). Great Lakes is not a party to this appeal. Plaintiff's complaint against the city alleged that on or about October 29, 2016, plaintiff was riding his bicycle in an area near 745 N. Milwaukee Avenue in Chicago that was "clearly marked for bicycle traffic" (a bike lane) which the city "intended to be used by bicycle traffic." The complaint alleged that a broken "delineator post" (which the city calls "bollards") with its shaft broken off existed in the area and that the city was negligent in failing to repair or replace the broken delineator post. Plaintiff alleged that as a result of the city's negligence, plaintiff "was thrown from his bicycle upon striking the broken delineator post *** and sustained serious injuries."

¶ 5      The "delineator post" was allegedly part of a "protective buffer strip" separating the bicycle lane from the traffic lane (the "buffer" or "buffer zone"). Unlike the bike lane, the buffer was marked with diagonal crosshatching and lined with flexible posts. The buffer separated the bike lane and the traffic lane with solid white lines on both sides of the buffer.

¶ 6      On May 31, 2019, the city filed a motion for summary judgment. The city's motion argued, in pertinent part, that pursuant to section 3-102(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/3-102(a) (West

2018)) the city did not owe plaintiff a duty because plaintiff was not an intended and permitted user of the area where the incident occurred. The city's motion claimed the area where the incident occurred was designated by the city as a "Barrier Protected Bike Lane" which uses "physical barriers, such as *** bollards [(delineator posts),] to separate bicyclists from motorists." The city argued that pursuant to our supreme court's decision in *Boub v. Township of Wayne*, 183 Ill. 2d 520 (1998), and *Vaughn v. City of West Frankfort*, 166 Ill. 2d 155 (1995), to determine a local public entity's intended use of its property it is appropriate to look to the nature of the property itself. The city argued there was "clear evidence" it did not intend bicyclists to use the buffer because its "barriers are delineated with solid while lines with solid white diagonal hash lines" and there are bollards placed in the barrier area." The city's motion argued the buffer "is intended as a barrier between bicyclists and motor vehicle traffic to protect the safety of the cyclists." The city argued that nothing about the buffer "exhibits any level of intent on the part of the city of Chicago that the barrier be used by bicyclists."

¶ 7 On August 27, 2019, the trial court entered a written order denying the city's motion for summary judgment. The trial court's written order described the area as follows. The space between the bike lane and the main car traffic lane is the "buffer zone." The buffer zone "is painted with thick striping parallel to the bike lane and with diagonal striping occasionally down the length of the space." Within the buffer zone "flexible barriers approximately 28 inches high are installed approximately every 40 feet. The barriers are built from a base and pole, and occasionally the poles will be broken from the bases."

¶ 8 The trial court found that it was clear that the city did not intend cyclists to ride along the buffer zone. The court found that a question of fact existed about whether the city intended and permitted bicyclists to cross the buffer zone to merge in or out of traffic, both to and from the

bike lane. The trial court found that questions of fact remained the precluded summary judgment and denied the motion. The city did not seek permissive interlocutory appeal.

¶ 9    At trial, plaintiff testified he was riding in the bike lane behind his wife when she signaled she was going to move to the left and exit the bike lane. Plaintiff was checking his surroundings, including looking over his shoulder for oncoming traffic, and started to move left. Plaintiff looked forward just as the front wheel of his bicycle struck the base of the broken delineator post.

¶ 10    David Gleason, one of the designers of the bike lane at issue, testified that providing a visual indication that a bike lane is present and discouraging motor vehicles from operating in the bike lane "are reasons for providing a flexible delineator." Gleason also testified that cyclists sometimes have to leave the bike lane for a variety of reasons. Gleason affirmed that when he designed the bike "facility" he designed the bike lane, the buffer, and the protective devices all as part of a single design project.

¶ 11    Nathan Roseberry, the senior engineer who worked on the design of the bike lane at T.Y. Lin, also testified that the design was all one project. The bike lane was not designed separately from the buffer, and neither were designed separately from the delineator posts; instead, "it was all one project." Roseberry testified that when he was designing the bike lane, he knew there was a bus stop in the area. Roseberry testified that the design "allowed for [a] bus to get to the sidewalk and allowed for a bike to pass a bus if it chose to do so." He understood that a person riding a bike "likely" would exit the bike lane to avoid a bus that was stopped at a bus stop.

¶ 12    On appeal, plaintiff claims he was exiting the bike lane to go around a bus at the bus stop. Monica Ko, plaintiff's wife, testified that she saw a bus in the bike lane ahead of her and signaled plaintiff that she wanted to exit the bike lane. At trial, plaintiff testified that when his

wife signaled she was exiting the bike lane he did not know where the bus was. Plaintiff also testified that when he exited the bike lane, he intended to cross both solid white lines and enter the vehicular traffic lanes.

¶ 13    Dr. Paul Dorothy testified as an expert witness for T.Y. Lin. T.Y. Lin designed the bike lane at issue. Dr. Dorothy testified regarding guidelines promulgated by the National Association of City Transportation Officials (NACTO). T.Y. Lin used the NACTO guidelines in designing the bike lane as recommended by the city in their contract. Dorothy opined that the use of flexible delineators "within the buffer between the traveled way of the bike facility and the general-purpose lanes is reasonably safe for all expected road users." Dorothy testified that when deciding the spacing for the delineator posts the considerations are that "the more tubular markers that I use; and the closer I space them together, the harder it is and the riskier it is for a cyclist to leave the bike lane mid-block." He continued, "if I've got closely spaced tubular markers, it's harder for me [(as a cyclist)] to maneuver through them. I'm at a greater risk for maneuvering through them."

¶ 14    The city filed a motion for a directed verdict at the close of plaintiff's case arguing that plaintiff was not an intended user of the buffer zone. The trial court denied the city's motion for a directed verdict. The matter went to the jury, and the jury returned a verdict in favor of plaintiff and against the city. The city filed a motion for a judgment notwithstanding the verdict (j.*n.o.v.*) arguing that the evidence at trial established that plaintiff "crossed over the solid white line of the marked bike lane and was in the area with diagonal stripes (buffer zone) that separates the marked bike lane from the vehicular traffic lane." The city argued that  because plaintiff had left the designated, marked bicycle lane and "crossed over the white line and into an area that was

not marked for bicycle use" when the accident occurred, he was not both an intended and permitted user of the roadway when he crashed; therefore, the city owed him no duty.

¶ 15     The city contrasted the bike lane, "so designated by solid white lines painted on the street in the area adjacent to the curb and a bicycle symbol with an arrow painted between those two solid while lanes," and the buffer zone, "marked with diagonal stripes" and flexible delineators within the buffer zone. The city admitted plaintiff was a permitted user of the roadway but argued "he was not an intended user once he left the marked bike lane and travelled into the buffer zone." The city argued that the fact plaintiff was near the bike lane did not make a difference. The city argued the property itself made its intent clear that the buffer zone was not intended for bicyclists. That intent was demonstrated by the "outer solid white line delineating the edge of the bike lane, followed by diagonal lines and the placement of the flexible delineators." The city argued plaintiff was not an intended user of the roadway at the time and location of his accident, therefore, the city did not owe him a duty and it should be granted j.*n.o.v.*

¶ 16     Following full briefing by the parties the trial court denied the city's posttrial motion.

¶ 17     This appeal followed.

¶ 18                                            ANALYSIS

¶ 19     This is an appeal from a judgment denying a motion for a judgment notwithstanding the verdict (j.*n.o.v.*) made after the trial court denied defendant's motion for a directed verdict at the close of plaintiff's case-in-chief. A party must file a posttrial motion for j.*n.o.v.* to preserve the denial of a motion for a directed verdict for review. *Hamilton v. Hastings*, 2014 IL App (4th) 131021, ¶ 30 ("The plain language of section 2-1202(a), that a party 'renew' a 'request' for a directed verdict, read in conjunction with section 2-1202(b)'s requirement a party specify the

type of relief desired, requires a party to request a judgment *n.o.v.* in its posttrial motion to preserve the issue for review."). The city did not renew its motion for a directed verdict at the close of all evidence. Nonetheless, the trial court denied the city's posttrial motion, so the ruling on the city's motion for directed verdict is properly before this court. *Ryan v. E.A.I. Construction Corp.*, 158 Ill. App. 3d 449, 456 (1987) (construing 735 ILCS 5/2-1202(a), (b) (West 2022) ("(a) If at the close of the evidence, and before the case is submitted to the jury, any party moves for a directed verdict the court may *** deny the motion *** and submit the case to the jury. If the court denies the motion *** the motion is waived unless the request is renewed in the post-trial motion. (b) *** Relief after trial may include the entry of judgment if under the evidence in the case it would have been the duty of the court to direct a verdict without submitting the case to the jury, even though no motion for directed verdict was made or if made was denied or ruling thereon reserved.")).

"Motions for a directed verdict and motions for a JNOV are made at different times during a trial but they pose the same questions and are governed by the same rules of law. [Citation.] Such motions are 'properly entered in those limited cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand." ' [Citations.] These motions present questions of law and questions of law are addressed *de novo* on appeal. [Citation.]

The standard for entering a directed verdict is high and not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. [Citation.] In ruling on these motions, a court does not weigh evidence nor consider credibility of witnesses; rather the court only considers the

- 7 -

evidence and any inferences therefrom in the light most favorable to the nonmoving party. [Citation.]" *Holt v. City of Chicago*, 2022 IL App (1st) 220400, ¶¶ 65-66.

¶ 20    "A complaint for negligence must establish that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the plaintiff sustained an injury proximately caused by the breach. [Citation.] Whether the defendant owes a duty of care to the plaintiff is a question of law." *Curatola v. Village of Niles*, 324 Ill. App. 3d 954, 958 (2001). Nonetheless, the standards for directed verdicts and judgments *n.o.v.* apply to our review when the motion for a directed verdict is directed at the question of whether a plaintiff is an intended user of public property. See *Curatola*, 324 Ill. App. 3d at 958-59 (citing *Pedrick v. Peoria & Eastern R.R. Co.,* 37 Ill. 2d 494, 510 (1967) (in ruling on denial of motion for directed verdict and later motion for j.*n.o.v.* on grounds the defendant did not owe the plaintiff a duty, holding that "[w]e cannot say that the evidence on this issue when viewed in a light most favorable to plaintiff, so overwhelming favors [the defendant] that no contrary verdict based on the evidence could ever stand.")).

¶ 21    The only element of plaintiff's case at issue in this appeal is whether the city owed a duty to plaintiff as an intended user of the area where the accident occurred.

> "The Local Governmental and Governmental Employees Tort Immunity
> Act provides that
>
> > 'a local public entity has the duty to exercise ordinary care
> > to maintain its property in a reasonably safe condition for the use
> > in the exercise of ordinary care of people whom the entity intended
> > and permitted to use the property in a manner in which and at such

times as it was reasonably foreseeable that it would be used.' 745

ILCS 10/3-102(a) (West 2018).

Thus, the first inquiry into whether the City owes a duty to plaintiff is

whether plaintiff was an 'intended and permitted' user ***. [Citation.] The act is

in derogation of the common law, so it must be strictly construed against the City.

[Citation.]" *Crespo-Fregoso v. City of Chicago*, 2021 IL App (1st) 200972, ¶ 19.

¶ 22 Our supreme court has held that the Tort Immunity Act defines the city's duty. *Alave v. City of Chicago*, 2023 IL 128602, ¶ 38 ("section 3-102(a) merely codifies the common-law duty of a local public entity to maintain its property in a reasonably safe condition" (internal quotation marks and citations omitted)). The city has a duty to maintain its property in a safe condition for intended and permitted uses. *Crespo-Fregoso*, 2021 IL App (1st) 200972, ¶ 19, *Alave*, 2023 IL 128602, ¶ 39.

"In truth, an intended user of property is, by definition, also a permitted

user; a permitted user of property, however, is not necessarily an intended user.

[Citation.] In this case, the parties agree that plaintiff was a permitted user of the

subject roadway. Accordingly, the remaining question is whether plaintiff was

also an intended user of the roadway." *Alave*, 2023 IL 128602, ¶ 39.

¶ 23 The city's duty, if any, arises in the context of plaintiff's use of the city's property as a bicyclist. To properly determine whether the city owed plaintiff a duty we must look to what evidence the court considers to determine whether a bicyclist is an intended and permitted user of the property at issue. Our supreme court recently clarified the answer to that question in *Alave*, 2023 IL 128602. In *Alave*, a bicyclist was riding in the city of Chicago on a roadway near a bicycle rental station (Divvy station). *Alave*, 2023 IL 128602, ¶ 1. The bicyclist was crossing

through a crosswalk and struck a pothole resulting in injuries. *Id*. ¶ 5. The bicyclist-plaintiff filed a complaint for negligence against the city alleging that he was an intended and permitted user of the subject roadway. The complaint alleged, in part, that the city intended bicyclists to use the roadway near the Divvy station. *Id*. ¶ 7. The city filed a motion to dismiss the complaint arguing the city did not owe the plaintiff a duty because the city did not intend bicyclists to use the subject roadway. *Id*. ¶ 9. The trial court granted the city's motion to dismiss the plaintiff's complaint. *Id*. ¶ 13. The plaintiff appealed (*id*. ¶ 17) and the appellate court reversed (*id*. ¶ 30).

¶ 24    Our supreme court began by noting the "touchstones" for determining whether a use is an intended use for purposes of section 3-102(a) of the Tort Immunity Act. *Id*. ¶ 40. To make that determination courts look to "the nature of the property itself" (*id*. (citing *Boub*, 183 Ill. 2d at 525, *Wojdyla v. The City of Park Ridge*, 148 Ill. 2d 417, 426 (1992), *Vaughn*, 166 Ill. 2d at 162-63), and look for " 'affirmative manifestations' [citation] such as signs, pavement markings, 'and other physical manifestations' [citation] to show that the City intends *** the roadway to be used in a certain manner (*id*. (citing *Boub*, 183 Ill. 2d at 528, 535)). Although it is a multi-factor test (*id*. ¶ 40 (citing *Boub*, 183 Ill. 2d at 525)) the court has "consistently declined to find municipal intent where there were no affirmative manifestations that designated the subject properties for the users in question" (*id*. ¶ 42 (citing *Wojdyla*, *Vaughn*, *Sisk v Williamson County*, 167 Ill. 2d 343 (1995), and *Boub*), *id*. ¶ 51 (citing *Boub*, 183 Ill. 2d at 528)). These "touchstones" apply to bicycle use. *Id*. ¶ 49 (citing *Boub*, 183 Ill. 2d at 528).

¶ 25    The inquiry into the "nature of the property" is a "fact-specific inquiry" (*id*. ¶ 77) and requires the court to look for affirmative manifestations of the intended use of the property such as signs, pavement markings, and other physical manifestations. *Id*. ¶ 56. Our supreme court stressed that the inquiry does not end with the presence or absence of signs and pavement

markings, and courts must also look at "other physical manifestations" of the intended use of the property *Id.* ¶ 58. This may require the court to look at the road itself. See *id.* (citing *Wojdyla*, 148 Ill. 2d at 426). "[D]etermining the intended use of municipal property is a case-by-case analysis, *** given the uniqueness of each property. [Citation.] Accordingly, a proper analysis is contextually limited to observing the specific property involved in the accident." *Id.* ¶ 77. The court must also be careful not to conflate intended use with permitted use. *Id.* ¶ 93 ("The need for a definitive and limited scope of duty furthers our earlier discussion of the importance of distinguishing between permitted and intended use.").

¶ 26    Additionally, the *Alave* court held that foreseeability of use is not "a means of proving that a use was intended" (*id.* ¶ 109), nor does custom and practice establish bicycling as an intended use of property (*id.* ¶ 110). Foreseeability is, however, "an additional requirement to establishing a duty." *Id.* ¶ 109. Finally, intent is not measured by the absence of an indicator of intent. *Id.* ¶ 112. In other words, the fact there is no expression that a use is not intended (*e.g.*, a sign or marking that bicycling is prohibited) does not mean that use is intended. See *id.* ¶ 112. The *Alave* court, "[a]fter considering all of the factors relevant to the nature of the property involved" concluded that "bicycling was not both a permitted and intended use of the subject roadway at the accident site." *Id.* ¶ 114.

¶ 27    In addition to applying the factors set forth by our supreme court in *Alave*, we must be mindful of the posture of this case. As stated above, this is an appeal from a judgment denying a motion for a j.*n.o.v.* following a motion for a directed verdict. For the city to be entitled to a verdict, all of the evidence, viewed most favorably to plaintiff, must overwhelmingly favor the city to the extent that no contrary verdict on the evidence could ever stand. *Curatola*, 324 Ill. App. 3d at 959. In this case, we cannot say the evidence on the issue of whether the city owed

plaintiff a duty as an intended user of the specific property involved in the accident so overwhelmingly favors the city that no contrary verdict based on the evidence could ever stand. *Id*. We look to the evidence propounded by the parties on appeal.[1]

¶ 28    Plaintiff presented evidence that the nature of the property and "other physical manifestations" show the city intended bicyclists to use the specific area of the buffer zone involved in the accident. The buffer zone and bike lane were part of a unified design that accommodated bicyclists traversing the buffer zone.

¶ 29    The city presented evidence that the city did not intend bicyclists to use the buffer zone and that bicyclists were merely permitted users of the buffer zone. The buffer zone was distinguished from the bike lane by pavement markings and had physical barriers that would prevent bicyclists from traveling along the buffer zone. We construe the city to argue that the existence of a bicycle lane—clearly intended for use by bicyclists—is a physical manifestation that the buffer zone is *not* intended for use by bicyclists. According to the city, "all of the signs, pavement markings, and other physical features" signal its intent that bicyclists should ride in the bicycle lane itself and not in the "protective buffer strip."

¶ 30    The city further argues that, looking for the "affirmative manifestations" of what it intends, here, it is "clear that the city did not intend for bicyclists to ride in the protective buffer

---

[1]    The appellant bears the burden of establishing error. See *In re D.S.*, 2021 IL App (1st) 192257, ¶ 19, *In re Alexander R.*, 377 Ill. App. 3d 553, 557 (2007) ("it is usually the appellant's burden to affirmatively demonstrate error from the record"). "We have said, on countless occasions, that we will not scour a record on appeal for reasons to overturn a judgment and that the appellant is responsible for citing to specific portions of the record for support of its position." *In re County Collector*, 2023 IL App (1st) 210523, ¶ 37.

strip." The city asserts the bike lane, which is "at the right edge of the roadway expressly for bicyclists, *** demarcated by a solid white line on the left and a bicycle symbol and arrow in the center," is the physical manifestation of its intent that plaintiff was *not* an intended user of the roadway *except* in the designated bike lane. The city argues the markings in the bike lane and the diagonal crosshatching and delineator posts, were clear visual clues signaling its intent bicyclists should ride in the bike lane and should not ride in the buffer strip.

¶ 31    Plaintiff, on the other hand, argues that looking at the nature of the property as a whole, as our supreme court requires, the "buffer zone" and the "bike lane" are all part of a unified "bike facility" for the intended use of bicyclists and the area where plaintiff was injured was part of that "bike facility." Plaintiff also relies on evidence from the designers of the "bike facility" that bicyclists would sometimes have to cross the "buffer zone" to change direction and for ingress and egress to the bike lane to reach their destination or to avoid hazards. Plaintiff also cites evidence that enabling bicyclists to cross the buffer zone was a consideration in placing the delineator posts and that the placement of the posts was decided, in part, for bicyclist safety when crossing the buffer zone.

¶ 32    We recognize that the question is not how bicyclists use the buffer zone or how bicyclists intend to use the buffer zone, or even whether they *need* to use the buffer zone—whether for ingress, egress, hazard avoidance, or any other purpose. Rather, the question for this court is whether the city *intended* bicyclists to use the specific property involved in the accident for those or for any other purpose (*Alave*, 2023 IL 128602, ¶¶ 88, 93 (citing *Curatola*, 154 Ill. 2d at 414, *Boub*, 183 Ill. 2d at 525)), and whether the evidence on that question overwhelmingly favors the city.

¶ 33    In this case we do not find an absence of affirmative manifestations that designated the subject property for the user in question. *Alave*, 2023 IL 128602, ¶ 42. The evidence of a unified design and that the delineator posts were designed at least in part to allow bicycle traffic to, at minimum, cross the specific part of the buffer zone involved in the accident, is evidence that the nature of the property as a whole (the roadway, the buffer zone, and the bike lane) and the "other physical manifestations" (the spacing of the delineator posts) are manifestations of the city's intent—rather than merely permission—for bicyclists to use the buffer zone in the place and in the manner plaintiff used the buffer zone. *Avala*, 2023 IL 128602, ¶ 40. Based on this evidence, we do not find that plaintiff totally failed to establish the existence of a duty. *Stackhouse v. Royce Realty & Management Corp.*, 2012 IL App (2d) 110602, ¶ 19 ("In a negligence action, where the plaintiff's evidence fails to establish the existence of a duty, a directed verdict is appropriate."), *Holt*, 2022 IL App (1st) 220400, ¶ 78 ("when contemplating a directed verdict, 'all the evidence is considered together with all reasonable inferences from its aspect most favorable to plaintiff.' [Citations.] After that consideration, if 'there is a total failure to prove any necessary element of plaintiff's case,' a directed verdict is justified."). Therefore, we cannot say as a matter of law that given the particular facts of this case the city did not owe plaintiff a duty.

¶ 34    We note that we granted the city's motion to cite *Foster v. City of Chicago*, 2024 IL App (1st) 231540-U, as additional authority. We have considered the city's additional authority, and given the different facts of the case, the value of that decision to this case is limited. See *Foster*, 2024 IL App (1st) 231540-U, ¶¶ 2, 6 (appeal from a grant of summary judgment where the bicyclist entered the roadway when the bike path was blocked by a parked vehicle).

¶ 35    We find that the evidence does not overwhelmingly favor the city, therefore the motion for j.*n.o.v.* was properly denied. *Curatola*, 324 Ill. App. 3d at 959 (finding that conflicting

evidence of whether the plaintiff was an intended user of the street because he was legally parked precluded a directed finding). Accordingly, we affirm the trial court's judgment.

¶ 36                                   CONCLUSION

¶ 37    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 38    Affirmed.